Gray, J. (dissenting).
A majority of my brethren have voted to reverse the judgment upon the verdict for the plaintiff, which *825 the learned trial judge directed, and which the general term below have affirmed, because they think the jury should have been allowed to pass upon the issues. As the case was developed the proof was such as to form a possible issue but upon one question of importance, and that was not material, in view of what had already been established by the evidence. That question, to which much prominence has been given, is whether Stokes agreed in March, 1889, to waive and to abandon any rights which he had acquired under the contract of December, 1888. I think that it is impossible, upon a careful consideration of this evidence, justly, to hold that any such question was open to opposing inferences.
To have sent the case to the jury, would have been, in effect, to authorize them to speculate and surmise with respect to questions, which either were not material, or were, from the nature of the proofs, susceptible of but one answer. The evidence conclusively shows when, in December, 1888, the negotiations for a delivery by Stokes of the telegraph properties resulted in the execution of a contract between him and De Castro, not only that Stokes held the legal title to and had the possession of all of them, and that they were the fruits of the efforts of Stokes through the purchase of the Bankers & Merchants’ Telegraph Company’s property and franchises and in their reorganization and development in the new United Lines Company under his control and presidency; but that he was a co-adventurer or partner with Mackay in the scheme to build them up and, eventually, to consolidate them with Mackay’s Postal Telegraph line, with an interest in these new properties, which his labor of years had created, which was to be reorganized in a participation in the profits or stock of the new corporation to be formed by consolidation. In this attitude of being the legal owner of the properties and entitled by promise, as by his conceded deserts, to some share or interest, Mackay. undertook to obtain from him the bonds and shares of the telegraph companies, through the agency of Platt’ and De Castro, the latter of whom for years had represented him in his various relations with Stokes, and was, with respect to obtaining these securities, particularly instructed and authorized by Mackay.
This contract for a sale of the telegraph properties is drawn up, which is signed by Stokes and by De Castro, and which is forwarded to Mackay for his signature. At the time of its execution Stokes refuses to hand over any securities to De Castro, but is willing that Ingersoll shall hold them, and, meanwhile, and until Mackay can be heard from, turns over $935,000 of bonds in part performance. Mackay is advised in the telegram from De Castro, on December 24th, of the deposit of the bonds, and that an agreement has been forwarded for his signature, which left Stokes out of the telegraph business. He was advised on the same day, in the telegram from Platt, that $1,600,000 of United Lines Company’s stock—a controlling interest—would be assigned if the agreement forwarded was signed. Thus Mackay was informed of a consummation of his agent’s negotiations in an agreement which *826 provided for Ms getting the properties and which left Stokes out of the telegraph business; that a large number of bonds had been deposited with Ingersoll, and that a controlling interest in the stock would be assigned when he approved of the agreement. He might have waited to read the contract, but he promptly telegraphed back to De Castro, “All right and satisfactory; ” and to Platt, “All right," and for him to take whatever securities Ingersoll gave him. De Castro gave Stokes a copy of Mackay’s telegram on December 26th, and, on the strength of Mackay’s distinctly expressed approval, Stokes delivers up the $1,600,000 of stock that day, as Ingersoll’s letter to Mackay, written in the afternoon, shows. Also, on that day, De Castro acknowledges upon the contract of the 24th the receipt of the securities, evidencing ready performance by Stokes, on his part of the contract, in giving over the securities and surrendering his control of the United Lines Company. When Mackay acknowledged the receipt of the contract, so far from expressing himself in repudiation and rejection of it, as it was his honest duty to do, if he did not propose to have anything to do with it, he simply takes exceptions to portions of it. He, in affirmative words, directs a retention of the, securities, obtained through his agent’s transactions, when he writes to Ingersoll: “ There is no necessity to make any change at present, except to place the securities with Platt for safe keeping." At that time, and from the time of the negotiations Ingersoll had ceased to be Stokes’ lawyer. He, himself, says: “ When they fell out, I stepped out." Occupying, therefore, in the commencement ostensibly a neutral position as depositary, the effect of Mackay’s letter of January 3d, was to make Ingersoll his custodian of the securities. It was utterly and clearly inconsistent with a rejection by Maekay of the contract that he should request no change to be made, and that a delivery of the securities should be made by Ingersoll to his financial agent, Platt. Mackay knew, of course, that those securities were in Stokes’ legal ownership and possession, and that something in the nature of a sale or transfer was necessary to get them over into his own possession. Both he and his agent De Castro knew that Stokes had an interest at stake in the telegraph properties. Hence, Mackay was bound to know, when he was informed of an agreement being made and of securities in part deposited with Ingersoll under it, and others to be deposited, if he was heard from in approval, that Stokes’ interests had been acquired on the basis of some consideration moving to him. Any other assumption would be foolish. It was open to Mm to defer expressing himself, but he elected to confirm his trusted agent’s transaction, and thus to obtain at once a delivery of the shares of stock, which carried the control of the United Lines Company, and in that he certainly succeeded. When, upon receipt of the contract, he saw that it effected a sale to him of the telegraph properties that did not surprise him, and very naturally so considering Stokes’ title, and his letter emphatically evidences his intention to hold on to the properties which Stokes had delivered. The sole question for Mackay on January 3d, when he *827 received the contract, was one of its adoption or of its rejection. His duty was plain and honest. The law rigidly held him to the duty of making known at once his answer with the text before him. He did not even hesitate then any more than when he telegraphed, in reply to the telegrams of December 24th, that it was all right and satisfactory, and thus secure possession of the $1,600,000 of stock upon strength of its distinct approval of De Castro’s act. By letters, as by telegrams, he was earnest in his desire to keep hold, through Ingersoll, of what Stokes had delivered, and to have them safely placed in the keeping of his financial agent, Platt.
I do not see how it can seriously be pretended either that from the moment Mackay wrote to Ingersoll on January 3rd, Ingersoll could have understood anything else than that Mackay proposed to hold onto the securities, and that he had not decided to reject the contract. Ingersoll would not have dared, after that letter to him, to give back the securities to Stokes. He was a good enough lawyer to know that thenceforth Mackay considered that he was holding them for him, and that his position was directly affected by the notice in Mackay’s letter. What was the result? On March 20, 1889, when Ingersoll turned over to Platt the securities he had received from Stokes, the receipts given show that between the time when the contract was signed and the $935,000 of bonds were delivered, Stokes, assured by Mackay’s prompt and emphatic telegraphic reply that he was satisfied with De Castro’s transaction, commenced, with the delivery of the 16,000 shares of stock, a faithful performance on his part of the agreement, and subsequently turned over 7,380 more shares .of the United Lines Co.’s stock, besides other bonds and shares. There was on Mackay’s part, with full knowledge of the facts, as complete an adoption of the contract his agent had undertaken to make as the law could ever require. Admitting that it was open to Mackay, when advised of the agreement, to refuse to be bound by it, by his failure to make known his refusal, and by his retention and ultimate acceptance' of the benefits of his agent’s transaction,. he, in legal effect adopted it as his own. To say that there was a question for the jury to decide, arising out of the conflicting testimony of Stokes and Ingersoll, after Mackay came on to Hew York in March, as to whether Stokes aid not agree to abandon the contract and to trust to Mackay’s generosity for his compention, is, as a proposition for consideration, too great a tax upon human credulity ; while as a legal proposition, it is untenable, in view of the acts of the parties. Mackay, by his acts, had become bound to abide by the contract. It was incumbent upon him, in the first place, if he would not be bound by the contract of his agent’s making, to say so in unequivocal terms; and afterwards, if he was going to repudiate his obligations, at any rate, to place Stokes back in his former position by returning all that he had delivered. This he did not do, and, therefore, the law does not allow him now to say, “ I did not come into this contract,” when Stokes, relying upon his acts, had honestly performed his part of ° *828 the agreement. It is a most extraordinary kind of an abandonment of a contract for one party to set up, when sued by the other to perform his obligation under it, having practically received all of the property called for by the contract, and the other party standing denuded through performance.
In view of the knowledge we have from the evidence as to Stokes’ original position and of the concession as to the prepon- " .derance of the evidence in favor of his right to compensation," and in further view of what was done under the contract, I think it is a very technical and a very unwarrantable conclusion to hold that it should have been left to a jury to determine whether or not there was in March an agreement by Stokes to abandon the contract and to rely on Mackay’s generosity for compensation.
I think we should affim this judgment.
Judgment reversed, new trial granted, costs to abide event.
Andrews, Ch. J., Finch and O’Brien, JJ., concur with Earl, J., for reversal; Gray, J., reads for affirmance; Peckham and Maynard, JJ., concur._